NUMBER 13-10-033-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI - EDINBURG  

                                                                                                                     


 

JESUS GARCIA JR.,                                                                          Appellant,

 

v.

 

THE STATE OF TEXAS,                         
                             Appellee.

                                                                                                                     
  

 

On appeal from the 105th
District Court 

of Nueces County,
Texas.

                                                                                                                     


 

MEMORANDUM OPINION

 

Before Justices
Garza, Vela, and Perkes  

Memorandum Opinion by
Justice Vela

            

            Following a gang-related shooting that killed
Danny Villarreal and wounded six-year-old T.R., a jury convicted appellant,
Jesus Garcia Jr., of murder (count 1), engaging in organized criminal
activity-murder (count 2), aggravated assault (count 3), and engaging in
organized criminal activity-aggravated assault (count 4).  See Tex. Penal Code Ann. § 19.02(b) (West
2003), § 22.02 (West Supp. 2010), § 71.02(a) (West Supp. 2010).  The jury
assessed prison sentences of fifty-five years, fifty years, twenty years, and
twenty years, respectively.[1] 
The jury also assessed a $10,000 fine for each conviction.  In two issues,
appellant argues he received ineffective assistance of counsel, and he
challenges the sufficiency of the evidence to support his convictions.  We
affirm.

I. Factual Background

A. State’s Evidence

                        Edward Morales,[2]
who joined the Mexican Mafia in 1987, testified that on July 25, 2008, he met
with Humberto Garcia,[3]
Anthony Gonzales, and appellant in the backyard of appellant’s home to plan
Danny Villarreal’s murder.  Morales identified appellant as the one who gave
the “orders” to do the “hit.”[4] 
When asked “[w]hat did he [appellant] tell you?”, Morales said, “That we were
supposed to go do this hit, if anything went wrong that I was supposed to take
the wrap [sic].”  Appellant said the plan called for him “and about 13 others,”[5]
to look for Villarreal.

That afternoon, several Mexican Mafia
members, including Morales and Humberto Garcia, arrived outside of a home on
Segrest Street in Corpus Christi.  The men had several firearms, including a
shotgun.  When Humberto Garcia signaled, everybody outside the house started
shooting at it.  At that time, Villarreal, Christina Cyr, and her three
children were inside the house.  Villarreal was shot and killed, and Cyr’s
six-year-old son, T.R., and two-year-old son, D.V., were wounded.  Morales
testified that appellant was a Mexican Mafia captain, but did not place him at
the scene of this shooting.

Conrado Castillo[6]
joined the Mexican Mafia in 1996 and knew appellant as a Mexican Mafia
captain.  On the day after the shooting, several Mexican Mafia members,
including appellant, met at Castillo’s house.  Castillo testified that during
the meeting, a person whom he knew as “Alex” asked appellant, “‘Hey, well did
you know that it’s against the rules and regulations of the Mexican Mafia to
shoot, . . . innocent people or kids, especially kids?’”  Castillo testified
that in answer to this question, “[T]hey said, all of them, Tiny [appellant],
Ghost [Anthony Gonzales] and Bird [Humberto Garcia] . . . said, ‘Hey, well, we
had no choice.  He shot first from the house so, . . . we had to do what we had
to do.’”

At trial, the prosecutor asked Castillo
“If the Mexican Mafia locally wants to put a hit on somebody or assassinate
someone, can somebody who’s not a ranking officer order it?,” Castillo replied
“He can order it, but it won’t get done unless the captain says.”  Castillo
also testified that appellant talked to him about ordering the “hit,” and that
was how Castillo was aware that appellant was involved in the shooting. 
Castillo testified he knew from talking to appellant and the other gang members
that appellant was not at the Segrest shooting.

B.  Defense Evidence

            Appellant’s wife, JoAnn Garcia, testified
that she and appellant were at home on the day of the shooting and that they
learned about it by watching the local news.  She stated that on that date, no
one came to their home.

            Appellant’s son, J.G., testified he was at
home with his parents on July 25, 2008.  On that day, he recalled seeing the
news on television and “saw a glimpse” of “[t]he house with all the bullet
holes in it.”  On cross-examination, when the prosecutor asked J.G., “[Y]ou
really don’t know everything he’s [appellant] doing while he’s there at the
house even though he’s there at home, right?”, he said, “No, sir.”

            Appellant took the stand in his own defense. 
He testified that while incarcerated for burglary of a habitation, “I first
encountered . . . communication with the Mexican Mafia.”  When defense counsel
asked him, “And have you ever been a member [of the Mexican Mafia]?,” he said,
“No, sir.”  Explaining a tattoo on his body, he stated that “it’s Orgullo
Mexicano . . . with the 5, 13, 5.”  He said that at the time he got the tattoo,
“I did not know what 5, 13, 5 meant and I really didn’t know that the ‘K’
symbolized only for the Mexican Mafia.”  He also testified that “the whole
reason behind the tattoo was the Orgullo Mexicano . . . part of which is the
Mexican pride.  I didn’t know that the 5 was the symbol for ‘e’, 13 was the ‘m’
and ‘e’.  I didn’t even know that you could spell the letter ‘m’ like that, and
then ‘K’ it only signifies for them.”  He stated that a Mexican Mafia member
“suggested” that I “cover it [the tattoo] up” because “it’s not like I’m a
member” of the Mexican Mafia.  Appellant followed the suggestion and had the
tattoo covered up.

 

            Appellant testified that on the date in
question, no one, including Edward Morales, came by his house to visit him. 
When defense counsel asked appellant, “[I]s there any truth to what he
[Morales] represented to this jury?”, he said, “None.”  He also stated that
Conrado Castillo’s testimony was “not true.”  However, when defense counsel
asked appellant, “Was there a time where you actually acknowledged being
esquina . . . or esquina firme [in the Mexican Mafia]?,” he said, “Yes, sir.”

            On cross-examination, when the prosecutor
asked appellant, “And you said while in prison you were esquina?,” he said,
“Esquina firme, sir, that’s right.”  When asked what “esquina firme” meant,
appellant said, “[T]hat means you’re just a member they [the Mexican Mafia] can
count on.”  In explaining how he got the “5, 13, 5 tattooed on” his body, he
stated he “picked out this tattoo . . . out of a picture album . . . although I
just wanted the Orgullo Mexicano, it came with the bullets and the 5, 13, 5. .
. .  Never did I think again that it symbolized the spelling of the word
eme[.]”[7] 
When the prosecutor asked him, “You also have tattoos that resemble a lot of
the tattoos that Mexican Mafia members use, correct?”, he said, “That’s right.”

C.  State’s Rebuttal

            Aaron Garcia, a parole-gang officer for the
Texas Department of Criminal Justice, Parole Division, testified the Mexican
Mafia likes to use the bullets of the “bandolero” as one of its tattoos.  He
stated that appellant’s tattoo “does have 13 bullets which signify the 13th
letter of the alphabet which is ‘m’.”

Officer Milo Loa testified that Corpus
Christi Police Chief Bryan Smith “had been threatened due to some remarks he
made” following the Segrest shooting.  Afterwards, Officer Loa and FBI agent
Bill Cassidy went to appellant’s home and told him that because of his
“standing in the gang being a ranking member, that nothing in this town
happened without his approval or his knowledge, that if anything happened to
the Chief that the full weight of the Federal Government and the Police
Department would use every legal resource to dismantle this organization.”

On cross-examination, when defense
counsel asked Officer Loa, “[W]hose decision was it to take the position, . . .
that [appellant] was a member of the Mexican Mafia and a ranking captain?”, he
said, “I think that’s common knowledge within the police department and law
enforcement agencies.”  He stated that “everything that I read, FBI reports
indicate—interviews, debriefs of defendants, everything indicates that he is
not an esquina, that he is a documented ranking member in the Mexican Mafia.”

II. Discussion

A.  Sufficiency of the Evidence

            We address issue two first wherein appellant
challenges the sufficiency of the evidence to support his convictions.  He
argues that because the State relied on the uncorroborated testimony of two
accomplice witnesses, Morales and Castillo, the evidence is insufficient to
support his convictions.

The
Accomplice-Witness Rule

            In Smith v. State, the court of
criminal appeals stated that, “under Texas Code of Criminal Procedure Article
38.14, a conviction cannot stand on an accomplice witness’s testimony unless
the testimony is corroborated by other, non-accomplice evidence that tends to
connect the accused to the offense.”  332 S.W.3d 425, 439 (Tex. Crim. App.
2011) (citing Tex. Code Crim. Proc.
Ann. art. 38.14 (West 2005)). 
“An accomplice is a person who participates in the offense before, during, or
after its commission with the requisite mental state.”  Id. (citing Druery
v. State, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007)).  “Presence at the
crime scene does not make a person an accomplice; an accomplice must have
engaged in an affirmative act that promotes the commission of the offense that
the accused committed.”  Id. (citing Druery, 225 S.W.3d at 498). 
“A person is not an accomplice if the person knew about the offense and failed
to disclose it or helped the accused conceal it.”  Id. (citing Gamez
v. State, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987)); Druery, 225
S.W.3d at 498; Cocke v. State, 201 S.W.3d 744, 748 (Tex. Crim. App.
2006).  “A witness who is indicted for the same offense or a lesser-included
offense as the accused is an accomplice as a matter of law.”  Id. (Cocke,
201 S.W.3d at 748).

            Here, it is undisputed that Morales, who participated
in the crimes and who subsequently pleaded guilty for his participation in
accordance with a plea agreement, is an accomplice.  See id. (stating
that “[a]n accomplice is a person who participates in the offense before,
during, or after its commission with the requisite mental state.”) (citing Druery,
225 S.W.3d at 498).  Thus, for the convictions to rest upon his testimony, “‘there
must simply be some non-accomplice evidence which tends to
connect appellant to the commission of the offense alleged in the
indictment.’”  Brown v. State, 270 S.W.3d 564, 567 (Tex. Crim. App.2008)
(quoting McDuff v. State, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997))
(emphasis in original).  

 

 

 

Appellant argues that any such
corroboration is lacking because Conrado Castillo is also an accomplice
witness.  We disagree.  Morales testified that after he was shot[8]
at the scene of the shooting outside Cyr’s home, he told the police that
Conrado Castillo was there, too.  However, on direct examination, when the
prosecutor asked Morales, “Were you mistaken about that [Castillo being at the
scene of the shooting]?”, he said, “Yes, sir.”  He testified that the person
who was at the shooting was not Conrado Castillo, but Conrado’s brother,
Gabriel Castillo.

Conrado testified he knew nothing about
the shooting until after it happened.  Thus, Conrado is not an accomplice
witness because he did not participate “in the offense before, during, or after
its commission with the requisite mental state.”  See Smith, 332 S.W.3d
at 439 (citing Druery, 225 S.W.3d at 498); Cocke, 201 S.W.3d at
747.  Even though Conrado testified he met with appellant the day after the
shooting, this does not make him an accomplice because he had not “engaged in
an affirmative act that promotes the commission of the offense that the accused
committed.”  Id. (citing Druery, 225 S.W.3d at 498). 
Furthermore, the record does not show he was indicted for the same offenses or
any lesser-included offenses as appellant.

Sufficiency
of the Non-Accomplice Evidence

“When reviewing the sufficiency of
non-accomplice evidence under Article 38.14, we decide whether the inculpatory
evidence tends to connect the accused to the commission of the offense.”  Id.
at 442 (citing Brown v. State, 672 S.W.2d 487, 488 (Tex. Crim. App.
1984)).  “The sufficiency of non-accomplice evidence is judged according to the
particular facts and circumstances of each case.”  Id. (citing Reed
v. State, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988)).  “The direct or
circumstantial non-accomplice evidence is sufficient corroboration if it shows
that rational jurors could have found that it sufficiently tended to connect
the accused to the offense.”  Id. (citing Simmons v. State, 282
S.W.3d 504, 508 (Tex. Crim. App. 2009); Reed, 744 S.W.2d at 126)).  “[I]t
is not appropriate for appellate courts to independently construe the
non-accomplice evidence.”  Id. (citing Simmons, 282 S.W.3d at
508).  Instead, we are required “to consider the combined force of all of the
non-accomplice evidence that tends to connect the accused to the offense.”  Id.
(citing Mitchell v. State, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983)). 

Here, to satisfy article 38.14, the
State relied on the following non-accomplice testimony:  (1) testimony that
appellant is a ranking member of the Mexican Mafia; (2) shortly after the
Segrest Street shooting, appellant and other Mexican Mafia members met at
Conrado Castillo’s home, where “Alex” questioned appellant about the shooting;
and (3) Conrado Castillo’s testimony that appellant told him that he ordered
the “hit.”  Our court of criminal appeals has held that “under most
circumstances, an admission or confession will be sufficient to corroborate the
accomplice-witness testimony.”  Brown, 270 S.W.3d at 568; Jackson v.
State, 516 S.W.2d 167, 171 (Tex. Crim. App. 1974) (stating “[i]t is well
established that [a defendant’s] admission or confession, under most
circumstances, will be sufficient to corroborate the accomplice witness.”); see
also Joubert v. State, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007)
(stating that a defendant’s “admission that he participated in the crime,
although he denied being a shooter, is enough to tend to connect him to the
offense.”).  After considering the combined force of all of the non-accomplice
evidence that tends to connect the accused to the offense, we hold the evidence
is sufficient to tend to connect appellant to the offenses for which he was
convicted.  

Standard
of Review

“When reviewing a case for legal
sufficiency, we view all of the evidence in the light most favorable to the
verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.”  Winfrey v.
State, 323 S.W.3d 875, 878-79 (Tex. Crim. App. 2010) (citing Jackson v.
Virginia, 443 U.S. 307, 319 (1979)).  Accordingly, “we ‘determine whether
the necessary inferences are reasonable based upon the combined and cumulative
force of all the evidence when viewed in the light most favorable to the
verdict.’”  Id. at 879 (quoting Clayton v. State, 235 S.W.3d 772,
778 (Tex. Crim. App. 2007) (citing Hooper v. State, 214 S.W.3d 9, 16-17
(Tex. Crim. App. 2007)).  “It has been said quite appropriately, that ‘[t]he
appellate scales are supposed to be weighted in favor of upholding a trial
court’s judgment of conviction, and this weighting includes, for example, the
highly deferential standard of review for legal-sufficiency claims.’”  Id.
(quoting Haynes v. State, 273 S.W.3d 183, 195 (Tex. Crim. App. 2008)
(Keller J., dissenting) (citing Jackson, 443 U.S. at 319)).  “We must
therefore determine whether the evidence presented to the jury, viewed in the
light most favorable to the verdict, proves beyond a reasonable doubt that
appellant” committed the crimes for which the jury found him guilty.  See id. 
“It is the obligation and responsibility of appellate courts ‘to ensure that
the evidence presented actually supports a conclusion that the defendant
committed the crime that was charged.’”  Id. at 882 (quoting Williams
v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)).  In addition, “‘[i]f
the evidence at trial raises only a suspicion of guilt, even a strong one, then
that evidence is insufficient [to convict].’”  Id. (quoting Urbano v.
State, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992)), superseded in part
on other grounds, Herrin v. State, 125 S.W.3d 436, 443 (Tex. Crim.
App. 2002).

1. Engaging in Organized Criminal
Activity-—Murder

            A
person commits the offense of engaging in organized criminal activity Aif,
with the intent to establish, maintain, or participate . . . as a member of a
criminal street gang, the person commits or conspires to commit . . . (1)
murder[.]”  Tex. Penal Code Ann. '
71.02(a)-(a)(1) (West Supp. 2010).  Section 71.01(d) defines a Acriminal
street gang@ as Athree
or more persons having a common identifying sign or symbol or an identifiable
leadership who continuously or regularly associate in the commission of
criminal activities.@  Id. '
71.01(d) (West 2003).  AConspires to commit@ means
that:

a person agrees with
one or more persons that they or one or more of them engage in conduct that
would constitute the offense and that person and one or more of them perform an
overt act in pursuance of the agreement.  An agreement constituting conspiring
to commit may be inferred from the acts of the parties.

 

Id. '
71.01(b).

            A person commits murder “if he:  (1)
intentionally or knowingly causes the death of an individual; (2) intends to
cause serious bodily injury and commits an act clearly dangerous to human life
that causes the death of an individual; . . . .”  Id. § 19.02(b)(1),
(2).  Murder is a “result of conduct” offense, which means that the culpable
mental state relates to the result of the conduct, the causing of the death.  Schroeder
v. State, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003).

            “A person acts intentionally, or with intent,
with respect to the nature of his conduct or to a result of his conduct when it
is his conscious objective or desire to engage in the conduct or cause the result.” 
Tex. Penal Code Ann. § 6.03(a)
(West 2003).  “A person acts knowingly, or with knowledge, with respect to a
result of his conduct when he is aware that his conduct is reasonably certain
to cause the result.”  Id. § 6.03(b).  A person’s knowledge and intent
may be inferred from the “acts, words, and conduct of the accused.”  Hart v.
State, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).  Intent to kill may be
inferred from the use of a deadly weapon.  Hardesty v. State, 825 S.W.2d
746, 749 (Tex. App.–Houston [14th Dist.] 1992, pet. ref’d).

            “A person is criminally responsible as a
party to an offense if the offense is committed by his own conduct, by the
conduct of another for which he is criminally responsible, or by both”.  Tex. Penal Code Ann. 7.01(a) (West
2003).  “A person is criminally responsible for an offense committed by the
conduct of another if:  (1) acting with intent to promote or assist the
commission of the offense, he solicits, encourages, directs, aids, or attempts
to aid the other person to commit the offense; . . . .”  Id. 7.02(a)(2).

            2. Analysis

a.
Sufficiency of the Evidence to Support Appellant=s Intent to
Participate as a Member of a Criminal Street Gang

 








            Aaron Garcia,
the parole-gang officer for the Texas Department of Criminal Justice, testified
the Mexican Mafia has a ranking structure starting at president and descending
to vice-president, generals, captains, lieutenants, sergeants, soldiers, and
esquinas.  He is familiar with the Mexican Mafia’s rules and regulations and
said the Mexican Mafia is a “criminal organization” involved in “anything
illegal to include extortion, murder, anything to get money to advance the
Mexican Mafia, . . . .”  Garcia knew appellant and confirmed him as a Mexican
Mafia member because he “has some tattoos on him that represent being a member
of the Mexican Mafia.”  He said that appellant has “tattoos of ‘Orgullo
Mexicano,’ . . . which means ‘Proud Mexican’ [a]nd only members of the Mexican
Mafia can use this tattoo, . . . .”  He also testified appellant had the
tattoos of the numbers 5, 13, and 5, “and only a modified member can have that
tattoo.”

            Edward Morales testified appellant
is a Mexican Mafia captain, who is in charge of the Mexican Mafia in Corpus
Christi.  He stated that as a captain, appellant gave all of the orders.  In
addition, Morales’s testimony showed that the Mexican Mafia members in Corpus
Christi are involved in “[a]ny criminal activity you can think of,” including
drug dealing, prostitution, money laundering, extortion, and murder.  He
testified that while acting as a Mexican Mafia captain, appellant ordered the
murder of Villarreal.  Thus, a rational jury could conclude that appellant was a
member of a criminal street gang at the time of Villarreal’s murder.  See
Tex. Penal Code Ann. 71.01(d)
(defining criminal street gang as three or more persons having a common
identifying sign or symbol or an identifiable leadership who continuously or
regularly associate in the commission of criminal activities).

            b. Sufficiency of the Evidence to Show Appellant Murdered
Villarreal

            A rational jury could have determined the following from the
evidence:  (1) appellant, while acting as a Mexican Mafia captain, had a
meeting with other Mexican Mafia members during which they planned Villarreal’s
murder; (2) at that meeting, appellant ordered Villarreal’s murder; (3) after
the meeting, Humberto Garcia, Morales and other Mexican Mafia members shot at
Cyr’s house, killing Villarreal; and (4) appellant had a motive to have
Villarreal killed.[9]

            The contrary evidence showed:  (1) on the day of the murder,
no one came to appellant’s house; (2) appellant had no involvement in
Villarreal’s murder; and (3) appellant was not a Mexican Mafia member, much
less a captain therein.

c.
Sufficiency of the Evidence to Show Appellant Conspired to Murder Villarreal

 

            A rational jury could infer from the evidence that appellant
agreed with one or more of the Mexican Mafia members to engage in conduct that
would constitute the offense of murder.  A rational jury could also infer that
one or more of these members performed an overt act in pursuance of the
agreement.  See id. 71.01(b) (defining Aconspires to commit@ as a person
agreeing with one or more persons that any one of them engage in conduct
constituting the offense and one of them performing an overt act in pursuance
of the agreement).

            Viewing all of the evidence in the light most favorable to
the verdict, we hold the evidence is legally sufficient for a rational jury to
find beyond a reasonable doubt that appellant engaged in the offense of
organized criminal activity because “with the intent to
establish, maintain, or participate . . . as a member of a criminal street
gang,” he conspired to commit the murder of Villarreal.  Viewing
all of the evidence in the light most favorable to the verdict, we also hold
the evidence is legally sufficient for a rational jury to find beyond a
reasonable doubt that appellant, acting as party, intentionally or knowingly
caused the death of Villarreal.

 

            3. Engaging in Organized Criminal Activity—Aggravated
Assault.

            A person commits the offense of engaging in
organized criminal activity if, with the intent to establish, maintain, or
participate . . . as a member of a criminal street gang, the person commits or
conspires to commit . . . aggravated assault[.]”  Tex. Penal Code Ann. 71.02(a)-(a)(1).  The Texas Legislature
has defined the crime of assault in section 22.01 of the penal code. 
Subsection (a) of that provision sets out three separate and distinct
assaultive crimes, one of which is relevant to the present discussion:  “(a) A
person commits an offense if the person:  (1) Intentionally, knowingly, or
recklessly causes bodily injury to another, including the person’s spouse[.]”  Id.
§ 22.01(a)(1) (West Supp. 2010).  “Subsection (1)—‘bodily injury’ assault is a
result-oriented assaultive offense. . . .”  Landrian v. State, 268
S.W.3d 532, 536 (Tex. Crim. App. 2008).  “Bodily injury” is defined as
“physical pain, illness, or any impairment of physical condition.”  Tex. Penal Code Ann. § 1.07(a)(7) (West
Supp. 2010).

            Section 22.02 of the penal code defines the
crime of aggravated assault as being an assault under section 22.01, and the
person “(1) causes serious bodily injury to another, including the person’s
spouse; or (2) uses or exhibits a deadly weapon during the commission of the
assault.”  Id. § 22.02.  Thus, “the use of a deadly weapon may act as an
aggravating factor for ‘bodily injury’ assault under Section 22.01(a)(1), . . .
.”  Landrian, 268 S.W.3d at 537.  A shotgun qualifies as a deadly weapon
per se.  Dominguez v. State, 125 S.W.3d 755, 761 (Tex. App.–Houston [1st
Dist] 2003, pet. ref’d).

               Section
7.02(b) of the penal code provides:

 

If, in the attempt to
carry out a conspiracy to commit one felony, another felony is committed by one
of the conspirators, all conspirators are guilty of the felony actually
committed, though having no intent to commit it, if the offense was committed
in furtherance of the unlawful purpose and was one that should have been
anticipated as a result of the carrying out of the conspiracy.

 

Tex. Penal Code Ann. §
7.02(b).  Therefore, the jury may convict appellant of the aggravated assault
of T.R. as a party to the offense if the jury found that:  (1) he conspired
with the other Mexican Mafia members to commit Villarreal’s murder; (2) the
aggravated assault occurred in furtherance of the murder; and (3) he should
have anticipated the aggravated assault of T.R. as a result of carrying out of
the murder conspiracy.  See Ex parte Martinez, 330 S.W.3d 891, 902 (Tex.
Crim. App. 2011); Ex parte Thompson, 179 S.W.3d 549, 552 (Tex. Crim.
App. 2005).

            Here, the evidence against appellant, in its
totality, would support a jury finding that he was a party to the offense of
T.R.’s aggravated assault.  There was evidence that:  (1) shortly before the
shooting, appellant met with his fellow gang members; (2) during this meeting,
appellant planned Villarreal’s murder with these gang members and ordered the
“hit”; (3) acting on appellant’s order, Mexican Mafia members went to Cyr’s
home and indiscriminately opened fire at it in an attempt to kill Villarreal;
(4) during this shooting, T.R., who was inside the house, was wounded by
shotgun pellets; (5) T.R. had surgery to remove the pellets[10];
and (6) evidence showed appellant, at the time of the shooting, was a captain
in the Mexican Mafia and that the gang engaged in murder as well as other
crimes.

            Even though appellant was not present during
the shooting of either T.R. or Villarreal, we point out that in order to
convict him of aggravated assault, the State did not have to prove that he
personally shot either victim.  Rather, the State merely had to prove he was
acting with others in the commission of Villarreal’s murder, that the
aggravated assault was committed in furtherance of Villarreal’s murder, and
that appellant should have anticipated that the aggravated assault of another
person present at the scene could be the result of Villarreal’s murder.  It is
reasonable to infer that when a gang leader such as appellant orders fellow
gang members to murder someone, he or she should anticipate that the gang
members who he or she ordered to commit the murder might shoot another during
the attempt to murder the intended victim.

            We hold that a rational jury could reasonably
conclude that appellant should have anticipated the aggravated assault on T.R.
as a result of carrying out the agreement to murder Villarreal.  Viewing
all of the evidence in the light most favorable to the verdict, we hold the
evidence is legally sufficient for a rational jury to find beyond a reasonable
doubt that appellant engaged in the offense of engaging in organized criminal
activity because, “with the intent to establish, maintain, or
participate . . . as a member of a criminal street gang,” he conspired to
commit the aggravated assault.  Viewing all of the evidence in
the light most favorable to the verdict, we also hold the evidence is legally
sufficient for a rational jury to find beyond a reasonable doubt that
appellant, acting as a party, intentionally, knowingly, or recklessly caused
bodily injury to T.R. by shooting him with a firearm.  Issue two is overruled.

 

 

 

B. Ineffective Assistance of Counsel

            In issue one, appellant argues he received ineffective
assistance of counsel.

Standard
of Review

            “A defendant has a Sixth Amendment right to effective assistance
of counsel,”[11] and counsel’s
“function ‘is to make the adversarial testing process work in the particular
case.’”  Ex parte Martinez, 330 S.W.3d at 900 (quoting Strickland v.
Washington, 466 U.S. 668, 690 (1984)).  “To obtain a reversal of a
conviction under the Strickland test, a defendant must show that:  (1)
counsel’s performance fell below an objective standard of reasonableness and
(2) counsel’s deficient performance prejudiced the defense, resulting in an
unreliable or fundamentally unfair outcome of the proceeding.”  Davis v.
State, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing Strickland,
466 U.S. at 687).  “Deficient performance means that ‘counsel made errors so
serious that counsel was not functioning as the ‘counsel’ guaranteed the
defendant by the Sixth Amendment.’”  Ex parte Napper, 322 S.W.3d 202,
246 (Tex. Crim. App. 2010) (quoting Strickland, 466 U.S. at 687).  “To
establish deficient performance, ‘the defendant must show that counsel’s
representation fell below an objective standard of reasonableness.’”  Id. 
(quoting Strickland, 466 U.S. at 688).  “The prejudice prong of Strickland
requires showing ‘a reasonable probability that, but for counsel’s
unprofessional errors, the result of the proceeding would have been
different.’”  Id. at 248 (quoting Strickland, 466 U.S. at 694). 
“‘A reasonable probability is a probability sufficient to undermine confidence
in the outcome.’”  Id. (quoting Strickland, 466 U.S. at 694).  “It
is not enough that counsel’s errors could have had ‘some conceivable effect on
the outcome of the proceeding,’ but a defendant does not have to show that
counsel’s deficient conduct ‘more likely than not altered the outcome of the
case.’”  Id. at 248-49 (quoting Strickland, 466 U.S. at 693). 
“This usual standard for showing prejudice is not always sufficient, however. 
If the proceeding was ‘rendered neither unreliable nor fundamentally unfair’ by
counsel’s deficient performance, then the prejudice question can be answered in
the negative to prevent the defendant from obtaining a ‘windfall.’”  Id.
at 249 (quoting Lockhart v. Fretwell, 506 U.S. 364, 366 (1993)). 
“[E]ach case must be judged on its own unique facts.”  Davis, 278 S.W.3d
at 353.

            1. Actual Conflict of Interest

            Appellant argues defense counsel was ineffective because of
an actual conflict of interest stemming from prior actions with the 148th
District Court.

            a. Procedural History

            Appellant’s case was originally set for trial in the 148th District
Court, Judge Marisela Saldana presiding.  After appellant’s defense counsel
finished general voir dire in appellant’s case, Judge Saldana held an in-camera
hearing during which she announced that in the afternoon before voir dire began
in appellant’s case, appellant’s defense counsel called her at home and
requested a face-to-face meeting with her.  He told her the matter was “urgent”
and “personal.”  The two met at Barnes & Noble, where defense counsel told
her that he had concerns about his friend,[12] who might have
suicidal ideations and was dating a woman who was not “beneficial” for the
friend.  Based upon what Judge Saldana “heard” on the morning of voir dire in
appellant’s case as well as defense counsel’s “maneuvering” to postpone the
trial, she became concerned about his “motive” for contacting her.  She told
defense counsel she was going to report him to the “State Bar” and that because
“this contact taints trial of this case,” she was going to transfer the case to
another court.  After the hearing, Judge Saldana dismissed the jury panel.

            The case was transferred to the 105th District Court, and
after appellant was convicted, his appellate counsel filed a motion for new
trial, alleging ineffective assistance of counsel.  The trial court held a
hearing on the motion, during which Inna Rogoff, an assistant district
attorney, testified that:  (1) she attended the meeting with Judge Saldana and
defense counsel at Barnes & Noble; (2) when defense counsel arrived for the
meeting, he was holding a “pretty thick” magazine; (3) defense counsel
“appeared to be very nervous with” her presence; (4) when Judge Saldana reached
for the magazine, defense counsel either “grabbed it out of her hands” or
“appeared” to do so; and (5) he took the magazine with him when he went to get
coffee.  Rogoff testified that “[i]t did appear that something was stuffed into
the magazine.”  She said that Judge Saldana and defense counsel engaged in
conversation that had nothing to do with appellant’s case.

            b. Applicable Law and Analysis

            The Sixth Amendment guarantees the right to reasonably
effective assistance of counsel, which includes the right to “conflict-free”
representation.  See Strickland, 466 U.S. at 687, 692; Cuyler v.
Sullivan, 446 U.S. 335, 348-50 (1980).  “An ‘actual conflict of interest’
exists if counsel is required to make a choice between advancing his client’s
interest in a fair trial or advancing other interests (perhaps his own) to the
detriment of his client’s interest.”  Ex parte Morrow, 952 S.W.2d 530, 538
(Tex. Crim. App. 1997).  See Acosta v. State, 233 S.W.3d 349, 356 (Tex.
Crim. App. 2007).  In order for a defendant to establish a violation of his
right to the reasonably effective assistance of counsel based on a conflict of
interest, “he must show (1) that defense counsel was actively representing
conflicting interests, and (2) that the conflict had an adverse effect on
specific instances of counsel’s performance.”  Id. (citing Cuyler v.
Sullivan, 446 U.S. 335 (1980)).  See Acosta, 233 S.W.3d at 356 (holding
that Cuyler standard is proper standard to analyze claims of ineffective
assistance because of conflict of interest).

            “[A] defendant who shows that a conflict of interest actually
affected the adequacy of his representation need not demonstrate prejudice in
order to obtain relief.”  Cuyler, 446 U.S. 349-50.  “But until a
defendant shows that his counsel actively represented conflicting interests, he
has not established the constitutional predicate for his claim of ineffective
assistance.”  Id. at 350.  In Cuyler, the Supreme Court held that
“the possibility of conflict is insufficient to impugn a criminal conviction. 
In order to demonstrate a violation of his Sixth Amendment rights, a defendant
must establish that an actual conflict of interest adversely affected his
lawyer’s performance.”  Id. at 350.

            In this case, appellant argues that defense counsel’s
“behavior on the eve of trial in the 148th District Court can only be
classified as a failed attempt to bribe Judge Saldana.”  We disagree.  The record
contains no evidence to support the argument that defense counsel ever tried to
bribe Judge Saldana.  Furthermore, Rogoff testified that the conversation
between Judge Saldana and defense counsel had nothing to do with appellant’s
case.  A conversation between a judge and a defense attorney, who is
representing a criminal client before the judge, that is unrelated to the
client’s case, does not alone mean that counsel is required to make a choice
between advancing his client’s interest in a fair trial or advancing other
interests to the detriment of his client’s interest.  See Ex parte
Morrow, 952 S.W.2d at 538.  More is required before it can be said that a
conflict actually exists.  See Acosta, 233 S.W.3d at 355.  We therefore
conclude that any conflict of interest in this case is merely speculative and
thus cannot support an ineffective assistance claim.  See Cuyler, 446
U.S. at 350.  We hold that because appellant cannot establish the “constitutional
predicate” that his defense counsel “actually represented conflicting
interests,” he cannot show that his counsel rendered ineffective assistance.  See
Cuyler, 446 U.S. at 349-50.

            2. Failure to Investigate and Interview Exculpatory Witnesses

            a. Applicable Law

            One of defense “counsel’s duties is that
of making an independent investigation of the facts of his client’s case.”  Butler
v. State, 716 S.W.2d 48, 54 (Tex. Crim. App. 1986).  This means “counsel
has the responsibility to seek out and interview potential witnesses.”  Ex
parte Welborn, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990).  A failure to
seek out and interview potential witnesses “’is to be ineffective, if not
incompetent, where the result is that any viable defense available to the accused
is not advanced.’”  Butler, 716 S.W.2d at 54 (quoting Ex parte Lilly,
656 S.W.2d 490 (Tex. Crim. App. 1983)).  “[A] claim for ineffective assistance
based on trial counsel’s failure to interview a witness cannot succeed absent a
showing of what the interview would have revealed that reasonably could have
changed the result of the case.”  Stokes v. State, 298 S.W.3d 428, 432
(Tex. App.–Houston [14th Dist.] 2009, pet. ref’d).

            b. Background

            Defense counsel did not testify during the hearing on the
motion for new trial.  However, at this hearing, the trial court admitted defense
counsel’s affidavit in which he stated, in relevant part, that “other than
alibi witnesses I did not direct or attempt to seek out and interview other
potential witnesses in an effort to uncover additional evidence that might
corroborate or exculpate [appellant], or impeach the State’s two primary
witnesses.”

            Defense counsel employed Leopoldo Sanchez to investigate
appellant’s case.  During the new-trial hearing, Sanchez testified he and
defense counsel talked about interviewing “some witnesses,” but Sanchez could not
remember their names.  Sanchez “reviewed and analyzed all the videotaped
statements by the State’s witnesses” and said that Edward Morales and Conrado
Castillo mentioned the names of many individuals who were involved in some
capacity with this case.  Sanchez was able to ascertain the names of seventeen
potential witnesses,[13] all of whom he
knew as alleged members of the Mexican Mafia.  He said that defense counsel did
not ask him to interview them.  Sanchez testified that “I know now that Rudy
Castro and Joe Madero [two of the seventeen potential witnesses], had they been
contacted . . . or interviewed prior to [appellant’s trial], . . . would have
been willing to testify at his trial now.”

 

            At the new-trial hearing, Castro and Madero appeared in
court.  Both of them announced that they did not want to testify on appellant’s
behalf.  Nevertheless, the amended motion for new trial included Castro’s
affidavit in which he stated that he was one of the persons who shot at the
home on Segrest Street.  As a result, he pleaded guilty[14] in exchange for a
thirty-year prison sentence.  He stated that if someone from appellant’s
attorney’s office had asked him to testify as a witness for appellant, he would
have testified:

            1. That the State’s witness
[Edward] Morales had perjured himself when he testified that [appellant] was
the person who had ordered Raul Valencia to be killed when in fact it was
Anthony Gonzales a/k/a “Ghost” who had ordered me and others to kill Raul
Valencia in retaliation for shooting at other members of our gang.

 

            2. That the State’s witness
[Edward] Morales had perjured himself when he testified that he got shot by
other members of our gang when in fact he got shot by someone inside victim
Daniel Villarreal’s house as he and I attempted to break and enter victim Danny
Villarreal’s house to kill Raul Valencia.

 

            c. Analysis

            Appellant argues defense counsel was
ineffective for failing “to interview or even contact witnesses who may have
exculpated” him at trial.  Because “[t]he two prongs of Strickland need
not be analyzed in a particular order,”[15] we decide whether
appellant satisfied the prejudice prong,[16] which requires us
to “ask whether there is a reasonable probability that the jury would have had
a reasonable doubt as to [a]ppellant’s guilt had . . . [the seventeen potential
witnesses] appeared at trial. . . .”  Perez v. State, 310 S.W.3d 890,
894 (Tex. Crim. App. 2010).  In Perez, the court of criminal appeals
followed the guidance of King v. State,
649 S.W.2d 42 (Tex. Crim. App. 1983), in which the defendant “asserted
ineffective assistance of counsel in part because no witnesses testified on his
behalf.”  Perez, 310 S.W.3d at 894 (citing King, 649 S.W.2d at
44).  The Perez court, quoting from King, stated that “the
‘failure to call witnesses at the guilt-innocence and punishment stages is
irrelevant absent a showing that such witnesses were available and appellant
would benefit from their testimony.’”  Id. (quoting King, 649
S.W.2d at 44).

            Here, during the
guilt-innocence stage, defense counsel called witnesses who testified on
appellant’s behalf.  In his affidavit, Castro stated he was available to
testify for appellant that Morales perjured himself when he testified that
appellant ordered Valencia’s murder.  However, this case involved the murder of
Danny Villarreal, not Valencia.  Morales testified that appellant ordered
Villarreal’s murder.

            Castro also stated he was available to
testify that Morales had perjured himself when he testified that he got shot by
other gang members when in fact, he got shot by someone inside the home in
which Villarreal was killed.  Morales testified that while outside the Segrest
home, he got shot.  He did not see who shot him but believed, based on
“rumors,” that one of the other gang members shot him.  Cyr, who was inside the
house during the shooting, testified that no shots were fired from inside the
house.  In addition, a police investigator found no evidence to show that
someone fired shots from inside the house.

            Thus, we do not see a reasonable
probability that Castro’s testimony would have changed the result of
appellant’s trial.  With regard to the other sixteen potential witnesses, the
record does not show what they would have testified to or that they were
available to testify at trial.  Thus, we cannot determine how their testimony
would have benefitted appellant’s case.  Ineffective assistance of counsel claims must
be firmly founded in the record and not based on retrospective speculation.  See
Bone v. State, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002).  We conclude that
appellant has not shown by a preponderance of the evidence that counsel’s
alleged “deficiency so compromised the proper functioning of the adversarial
process that the trial court cannot be said to have produced a reliable
result.”  See Ex parte Martinez, 330 S.W.3d at 901 (citing Strickland,
466 U.S. at 686).

            3.  Failure to Adequately Impeach Morales and Castillo

            Appellant argues defense counsel was ineffective because he
failed to adequately impeach Edward Morales and Conrado Castillo.  However,
“[t]he fact that the testimony may have been subject to impeachment . . . goes
to the weight of the evidence and not to its admissibility.”  Brown, 270
S.W.3d at 568; see Tex. R. Evid.
609, 613.  Even assuming defense counsel was deficient for failing to
adequately impeach these two witnesses, we conclude appellant has not shown by
a preponderance of the evidence that counsel’s alleged “deficiency so
compromised the proper functioning of the adversarial process that the trial
court cannot be said to have produced a reliable result.”  See Ex
parte Martinez, 330 S.W.3d at 901 (citing Strickland, 466 U.S. at
686).

            4. Failure to Develop a Theory of Defense

            Appellant argues defense counsel was ineffective because he
failed to develop any theory of defense to create a sound trial strategy. 
There was no evidence placing appellant at or near the scene of the Segrest
shooting.  Therefore, the State’s case was that appellant, as a Mexican Mafia
captain, planned and ordered the murder of Danny Villarreal.  In an effort to
counter the State’s theory of criminal liability, defense counsel elicited the
testimony of appellant as well as appellant’s wife and son to show that:  (1)
appellant was neither a Mexican Mafia member nor a Mexican Mafia captain; (2)
appellant did not plan Villarreal’s murder; and (3) appellant did not order
Villarreal’s murder.  This is a sound and valid trial strategy based upon the
facts of this case.  Furthermore, there was no evidence that the testimony of
any additional witnesses would have benefited appellant.  We conclude defense
counsel’s performance fell within the range of professional competence. 
Therefore, appellant has failed to prove ineffective assistance of counsel
pursuant to Strickland.

            5. Failure to Object to Hearsay Testimony

            Appellant argues defense counsel was
ineffective for failing to object to Conrado Castillo’s hearsay testimony.  He
refers to several instances where the prosecutor, without any objection from
defense counsel, elicited hearsay testimony from Castillo.

            a. Background

            Castillo testified that on
the date in question, he received a call from two Mexican Mafia members,
Gilbert Castro and Joe Maldonado,[17]
who told him, “[W]e just took care of business over here in Corpus.”  Maldonado
did not tell Castillo what he meant by “business,” but said they were “stranded
at North Beach” and needed a ride.  Afterwards, Castillo called Jody Acosta,[18]
who offered to pick them up.  Castillo testified that while he was at 
Maldonado’s house in Taft, “I was . . . first aware of . . . [t]he death of Mr.
Villarreal, Danny.”  He said that Maldonado and Castro “were scared, . . .
because they said that when they were shooting, that they could hear the little
kids [Cyr’s children] crying.”  When Castillo’s cousin, Reynaldo Castillo,[19]
heard that the children were crying, he reminded them that Mexican Mafia rules
do not allow gang members to hurt innocent bystanders and decided to call
appellant “to see what’s going on.”[20] 
During this conversation, Reynaldo and appellant set up a meeting for the next
day at Castillo’s home.  At that meeting, Anthony Gonzales and Humberto Garcia
started “bragging about what they had done, . . . chopping down [Cyr’s] house.
. . .”  Another gang member, “Alex,” asked appellant, “‘Hey,
well did you know that it’s against the rules and regulations of the Mexican
Mafia to shoot, . . . innocent people or kids, especially kids?’”

            b. Analysis

            Even assuming that defense counsel was deficient for failing
to make hearsay objections to the aforementioned testimony, the hearsay does
not directly implicate appellant either in the murder of Villarreal or the
aggravated assault on T.R.  Other non-hearsay testimony linked appellant to the
offenses.  We therefore conclude appellant has not shown by a preponderance of
the evidence that counsel’s alleged “deficiency so compromised the proper
functioning of the adversarial process that the trial court cannot be said to
have produced a reliable result.”  See id. (citing Strickland,
466 U.S. at 686).

6.
Failure to Object to Improper Extraneous Bad Act, or Obtain a Limiting
Instruction

 

            Appellant argues defense counsel was ineffective for failing
to object to the testimony of Officer Milo Loa “regarding an alleged ‘hit’ on
the Chief of Police of Corpus Christi.”  We note that Officer Loa, a State’s
rebuttal witness, did not testify that appellant ordered any “hit” on the
police chief, or that he threatened the police chief.  Nevertheless, even
assuming defense counsel was deficient for failing to object to Loa’s
testimony, or request a limiting instruction, the prejudice prong of Strickland
requires an appellate court to “look to the totality of the circumstances and
evidence presented to determine if there is a reasonable probability that, but
for [c]ounsel’s deficient performance, the result of the proceeding would have
been different.”  Strickland, 466 U.S. at 694.

We conclude the record does not support
the conclusion that appellant met the second prong of the Strickland
test.  Even though the evidence did not show that appellant was one of the
shooters, the evidence did show he planned and ordered Villarreal’s murder and
that the gangsters who carried out this plan wounded T.R. in the process.  We
cannot say that there is a reasonable probability that the outcome would have
been different if defense counsel had either objected to, or requested a
limiting instruction with regard to Officer Loa’s testimony.

7.
Failure to Object to Jury Charge or Request an Accomplice Jury Instruction

 

            Appellant argues defense counsel was ineffective for failing
to object to the jury charge and by not requesting an accomplice jury charge
regarding Conrado Castillo’s testimony.

a. Applicable Law

            “A State’s witness may be an accomplice as a matter of law or
as a matter of fact.”  Smith, 332 S.W.3d at 439.  “The evidence in each
case will dictate whether an accomplice as a matter of law or fact instruction
is required.”  Id.  When “there is no doubt” that a witness is an
accomplice as a matter of law, the trial court must instruct the jury
accordingly.  Id.  “A witness who is indicted for the same offense or a
lesser-included offense as the accused, is an accomplice as a matter of law.”  Id. 
When there is doubt concerning whether a witness is an accomplice (i.e., the
evidence is conflicting), then the trial court may instruct the jury to
determine a witness’s status as a fact issue.  Id. at 439-440.  However,
“when the evidence clearly shows that a witness is not an accomplice, the trial
judge is not obliged to instruct the jury on the accomplice witness rule—as a
matter of law or fact.”  Id. at 440.

b. Analysis

            We previously held that Conrado Castillo was not an
accomplice.  Furthermore, he was not indicted for the same offense or a
lesser-included offense as appellant.  Thus, the trial court was not required
to instruct the jury, and defense counsel’s failure to object to the charge and
request an accomplice jury instruction did not constitute deficient
performance.  We conclude appellant has failed to satisfy the first prong of Strickland. 
Issue one is overruled.

 

 

III. Conclusion

            We affirm the trial court’s judgment.  

 

 

 

                                                                                         ROSE
VELA

                                                                                         Justice

 

Do not publish.

Tex.
R. App. P.
47.2(b).

 

Delivered and filed
the   

16th day of June, 2011.

 

 

 









[1]These
sentences are to run concurrently.

 





[2]In
exchange for his testimony, Edward Morales received a twenty-year prison
sentence for his role in Danny Villarreal’s murder.

 





[3]The
evidence showed Humberto Garcia was a sergeant in the Mexican Mafia.

 





[4]At
the prosecutor’s request, the trial court allowed the record to reflect that Morales
had identified appellant, who was seated at counsel table.

 





[5]When
the prosecutor asked Edward Morales to give their names, he said, “Eriberto
Mendez, Humberto Garcia, Joe Angel Madero, Jose Olvera, Anthony Gonzales, a
person nicknamed “Guero,” and another person nicknamed “Gordo.”  He did not
know the names of the other persons involved in the shooting.  Later, during
his direct-examination, Morales identified Gabriel Castillo as being present
during the shooting.

 





[6]At
the time of trial, Conrado Castillo had a sentencing hearing pending in federal
court for possession of “drugs.”  In exchange for testifying against appellant,
the prosecutor formerly in charge of appellant’s case agreed to “send a letter
or tell the Federal people that [Castillo was] cooperating with” the State.  

 





[7]The
numbers “5, 13, 5” relate to the fifth, thirteenth, and fifth letters of the
alphabet, or “eme.”  The letters “eme” are a symbol used by the Mexican Mafia.





[8]Edward
Morales testified that after he turned around to leave the scene of the Segrest
shooting, he got shot.  While recovering from this wound, he told police
investigators he did not know who gave the order to kill Villarreal.  However,
he also testified he told them this “because I was scared.”





[9]Edward
Morales testified appellant gave the order to kill Danny Villarreal because “an
ex-member of the Mexican Mafia shot at some members of the Mexican Mafia.”





[10]Christina
Cyr testified, “They had to cut into his [T.R.’s] skull to remove the pellets.”





[11]Ex
parte Martinez, 330 S.W.3d 891, 900 (Tex. Crim. App. 2011) (citing U.S. Const. amend. VI).





[12]Judge
Saldana gave the name of defense counsel’s friend; however, for reason of
confidentiality, we will not mention the friend’s name.





[13]These
people were Gilbert Castro, Joe Maranado, David Macada, Gilbert Garcia, Raul
Benavides, Jason Prado, Jimmy Salinas, Jose Olvera, Randy Ramirez, Edward
Morales, Rudy Castro, Humberto Garcia, Anthony Gonzales, Joe Madero, Eriberto
Mendez, Reynaldo Castillo, and Jody Acosta.





[14]Castro
did not say what crime he pleaded guilty to. 

 





[15]Ex
parte Martinez, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

 





[16]See
Strickland v. Washington, 466 U.S. 668, 697 (1984).





[17]Castillo
testified that Joe Maldonado is a Mexican Mafia member.

 





[18]Castillo
testified Jody Acosta is a Mexican Mafia member.

 





[19]Castillo
testified Reynaldo Castillo is a Mexican Mafia member.

 





[20]Castillo
did not testify about anything that was said between Reynaldo Castillo and
appellant that would implicate appellant either in Villarreal’s murder or the
aggravated assault on T.R.